UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA : 
 : 
 : 
v. : Case No.: 8:25-CR-498-JLB-AEP-1
 : 
 : 
GEORGE RUSSELL ISBELL : 
_____ : 

## DEFENDANT GEORGE RUSSELL ISBELL'S MOTION FOR DISTRICT COURT REVIEW OF THE MAGISTRATE JUDGE'S DENTENTION ORDER AND REQUEST FOR PRETRIAL RELEASE

COMES NOW, the Defendant, GEORGE RUSSELL ISBELL, by and through undersigned counsel, pursuant to 18 U.S.C. § 3145(b), and hereby moves this Honorable Court for review of the order of detention imposed in the instant case and for the entry, in its place, of an order of pretrial release, and in support states as follows:

### I.    Procedural History

The Defendant was arrested during the early morning hours of October 7, 2025, on a Middle District of Florida, Tampa Division, criminal complaint, in the Southern District of California, San Diego Division. An initial appearance was held later that day wherein the government requested detention based on danger to the community only.

A detention hearing was ordered for October 10, 2025.

On October 10, 2025, the government amended its motion for detention to also include risk of flight. After a short detention hearing, wherein no defense witnesses were called, the magistrate court denied the Defendant's release from custody, citing his concern the Defendant is a danger to the community.

The magistrate court did not find the Defendant was a risk of flight.

The Defendant has been in continuous custody of the United States Marshal since his arrest. Initially held at the San Diego Federal Detention Center, the Defendant traveled across the country in various county lockups until his arrival at the Pinellas County Jail in Clearwater, Florida, where he currently is being held pending trial.

## II.    Federal Statutory Penalty Analysis

What follows is an analysis of the indictment.

<u>Count One</u>

Count One of the Indictment charges that on or about September 18, 2025, the Defendant transmitted, in interstate commerce, a communication containing a threat to injure Victim 1 with the intent to communicate a true threat of violence and with recklessness as to whether the communication would be viewed as a true threat of violence, in violation of 18 U.S.C. § 875(c).

*Elements*

A person can be convicted of this offense if all the following elements are proven beyond a reasonable doubt: (1) the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another; and (2) the Defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat.

*Penalty*

The statutory penalty is a maximum sentence of five years' imprisonment.

<u>Count Two</u>

Count Two of the Indictment charges that on or about September 18, 2025, the Defendant deposited in an authorized depository for mail matter, to be sent and delivered by the United States Postal Service, and caused to be delivered by the United States Parcel Service according to the directions thereon, a communication addressed to Victim 1, which contained a threat to injury Victim 1, with the intent to communicate a true threat of violence, and with recklessness as to whether the communication would be viewed as a true threat of violence, in violation of 18 U.S.C. § 876(c).

*Elements*

A person can be convicted of this offense if all the following elements are proven beyond a reasonable doubt: (1) the Defendant knowingly used the United

States Mail to send a true threat to injure the person of another; and (2) the Defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat.

<em>Penalty</em>

The statutory penalty is a maximum sentence of five years' imprisonment.

## III.    Federal Sentencing Guideline Penalty Analysis

<u>Determining the Total Offense Level</u>

| | |
|---|---|
| Base Offense Level**:** The base offense level is 12. USSG § 2A6.1(a)(1). | 12 |

| | |
|---|---|
| Adjusted Offense Level: | 12 |

| | |
|---|---|
| Acceptance of Responsibility:  If the Defendant accepts responsibility for the offense, the offense level will be decreased by two levels under USSG §§ 3E1.1(a). | -2 |

| | |
|---|---|
| Total Offense Level: | 10 |

<em>Potential Positive Guideline Consideration</em>

Single Instance with Little Deliberation: If the district court finds that (A) USSG § 2A6.1(a)(2) and §§ 2A6.1(b)(1) – (5) do not apply and (B) the offense involved a single instance evidencing little or no deliberation, then the offense level may be reduced by four levels under USSG § 2A6.1(b)(6).

<u>Criminal History</u>

Based upon an NCIC report provided by the government, undersigned counsel presents the Defendant's criminal history in Presentence Investigation

4

Report format (due to the parties and the district court being familiar with this format).

Undersigned counsel assigned a point value to each criminal history entry, pursuant to the process called "scoring." Chapter Four of the Sentencing Guidelines Manual establishes the rules for scoring criminal history. The rules focus on (1) the date a prior sentence is imposed and (2) the specific sentence imposed in the prior case.

The rules in Chapter Four state that the applicable time periods for scoring prior criminal convictions are based on the offense commencement date, which means the earliest date of relevant conduct. The material I reviewed shows that you commenced the offense on September 18, 2025. According to the rules in USSG § 4A1.2(e), the five-year cutoff date for scoring prior convictions is September 18, 2025; the ten-year cutoff date for scoring prior convictions is September 18, 2015; and the fifteen-year cutoff date for scoring prior convictions is September 18, 2010. Offenses that occurred outside these time periods receive no criminal history points.

| Date of Arrest or Offense | Charge/Court | Disposition | Score |
|---|---|---|---|

*Juvenile*

| 08/26/1973 (Age 17) | Burglary Department of Public Safety Austin, Texas | No disposition recorded | 0 |
|---|---|---|---|

No criminal history points will be assessed for this case.

*Adult Convictions*

| 05/14/1998 (Age 41) | (1) – (3) Sending or Possessing Obscene Material (4) Certificate of Payment Required (5) Unemployment Insurance Violation Superior Court, San Diego, California Case No. M758386 | (1) – (5) Dismissed | 0 |
|---|---|---|---|

No criminal history points will be assessed for this case.

| 11/06/1998 (Age 42) | Grand Theft: Money, Labor, or Property Sheriff's Department, San Diego County, California | Lack of Sufficient Evidence | 0 |
|---|---|---|---|

No criminal history points will be assessed for this case.

| 10/19/2018 (Age 62) | (1) – (2) Failure to Observe Issued Stop Order (3) – (5) Failure to Secure Worker's Superior Court, San Diego County, California Case No. M095204 | (1), (4), and (5): Convicted (misdemeanor); 3 years' summary probation; fine; restitution (2) and (3) Dismissed 06/15/2021: Probation terminated | 1 |
|---|---|---|---|

One criminal history point will be assessed for this conviction.

*Criminal History Score and Category*

The Defendant's criminal history score is 1. Therefore, his criminal history category is I. USSG Ch. 4, Pt A (Criminal History) and USSG Ch. 5, Pt. A (Sentencing Table).

<u>Federal Sentencing Guideline Imprisonment Range</u>

Should the Defendant timely plead guilty and receive at minimum the reductions discussed above, based on a total offense level of 10 and a criminal history category of I, his advisory federal guideline imprisonment range is 6 months to 12 months.

However, because the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by (1) a sentence of imprisonment; (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in § 5C1.1(e), provided that at least one month is satisfied by imprisonment; or (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in § 5C1.1(e).

Thus, should the Defendant plead guilty and receive a bottom of the guideline imprisonment range sentence as is customary in this district, by the time he is sentenced there could very well be a credit for time served disposition.

This estimate does not include any departures (other than set forth above) or variances.

## IV.    The Defendant's Background

Full details of the Defendant's personal background, including his serious medical conditions that were not fully presented to the magistrate court during his first bond application, are as follows:

<u>Personal and Family History</u>

George Russell Isbell, Jr., was born on August 8, 1956, in St. Louis, Missouri, to Margaret and George Isbell. He has five siblings - two brothers and two sisters. His early childhood was rooted in Saint Louis until the family relocated within Missouri for a few years, eventually settling in Ennis, Texas, when George was about nine. He remembers his upbringing as warm, stable, and loving. His parents were not wealthy, but the family always had what they needed - food on the table, clothes to wear, and a safe home. Summers often included family vacations, usually to visit relatives in Texas or Missouri, and those trips remain meaningful memories for him.

George describes his relationships with his siblings as typical - some arguments and tensions here and there, but nothing that overshadowed the closeness of the family as a whole. His mother worked as a telephone operator, and his father installed equipment for Western Bell, which is how the two of them met. George was extremely close to his mother and believes he may have been her favorite. Some of his fondest memories come from the bowling leagues they joined together. She was an excellent bowler, and he cherished the time they spent as a team.

In 1975, at age eighteen, George moved to San Diego after joining the Navy. A year later, he met Robert Clark, the man who would become the love of his life. They shared a home and a committed relationship from 1975 until Robert's death in 2007. Robert, who was ten years older than George, died from cancer linked to Agent Orange exposure during his military service in Vietnam. Their life together had normal ups and downs of adult relationships, but George describes the relationship as deeply loving and solid.

Today, George grieves the death of Robert (October 22, 2025, would have been their fiftieth anniversary) and the more recent deaths of his parents. Although he has relationships with all his siblings, he remains very close to his sister Linda. He also maintains strong ties with Robert's sister and one of Robert's brothers.

George has built meaningful friendships as well, including a close friendship with Stephan, his store manager.

*Analysis*

George's personal and family history presents a picture of someone who grew up in a stable, loving household and maintained long-term, meaningful relationships throughout his life. Under 18 U.S.C. § 3553(a)(1), his background reflects strong family values, steady emotional development, and a consistent ability to form deep, lasting bonds - all of which bear on his character and the likelihood of law-abiding behavior moving forward.

George's early years show a grounded childhood without trauma, neglect, or instability. The fact that he speaks warmly of his upbringing, remembers positive family traditions, and still carries fond memories of activities with his mother underscores a foundation of emotional security. This type of background often correlates with a capacity for stable relationships, routine, and consistent behavior - qualities relevant to both mitigation and release.

George's decades-long partnership with Robert is especially significant. Maintaining a committed relationship for more than thirty years demonstrates loyalty, emotional maturity, and stability. His enduring connections with Robert's family even after Robert's death reflect the same qualities. The grief he continues to experience over Robert's passing, and more recently his parents' deaths, adds

context to his emotional landscape and helps explain some of the weight he carries today.

Although he is not close to all his siblings, George still has strong support from others, particularly his sister Linda. He also has close connections through his business, including his strong friendship with Stephan. These relationships suggest he has ongoing community ties and a supportive network - factors that are relevant to the history and characteristics inquiry and to assessing his stability outside of custody.

From a release perspective, individuals with long-standing, positive relationships and strong social ties typically present as reliable and grounded. George's network of supportive family and friends reinforces the idea that he has anchors in the community and people who care about his well-being. That stability aligns with the traits of someone capable of complying with conditions of supervision.

George's personal history reflects a life shaped by steady relationships, emotional stability, and enduring family bonds. These qualities meaningfully support sentencing mitigation and favor a measured consideration of release on appropriate conditions.

<u>Educational History</u>

In 1974, George graduated as a four-year honor graduate from Ennis High School in Ennis, Texas. He received the Senior Year 'Book' award for Chemistry and Drama. Although he remembers being bullied because he was gay, George recalls high school as a generally positive experience. He had friends, found his place socially, and especially thrived in the band. He played both the trumpet and the French horn, and he excelled to the point of earning numerous awards for his musical talent.

After high school, George joined the United States Navy, a step that ultimately led him to San Diego. During this period, he began pursuing a long-held dream of becoming a doctor. In 1980, he earned a bachelor's degree in biochemistry from the University of California - San Diego. Although he initially planned to continue to medical school, his life took a different direct once he and his partner, Robert, decided to go into business together.

Years later, in 1990, George returned to school and earned a Bachelor of Arts degree in interior design from the design institute of San Diego. While he did not turn this degree into a formal career, he found practical ways to use this training period he has helped friends with design projects and applied his design skills to the layout and presentation of his own stores.

In 2005, George also completed a year of on-line legal studies through Concord Law School (now known as Purdue Global Law), a Los Angeles, California, based institution.

*Analysis*

George's educational background reflects intellectual ability and a consistent commitment to self-improvement - factors that carry substantial mitigation value. His experiences in high school, including coping with bullying related to his sexual orientation, show early adversity that he navigated successfully, maintaining stability and excelling in extracurricular activities. This history underscores qualities of perseverance and emotional maturity relevant to 18 U.S.C. § 3553(a)(1)'s consideration of personal "history and characteristics."

George's academic achievements demonstrate strong cognitive capacity and discipline, and the pursuit of a medical career, even though he ultimately chose a different path, is evidence of ambition and long-term goal setting.

George's decision later in life to return to school and earn a second bachelor's degree in interior design reflects lifelong learning and adaptability. Even though he did not pursue interior design professionally, he used that knowledge productively to improve his businesses and assist others. This shows that he approaches education with sincerity and applies what he learns in constructive ways.

George's brief enrollment in online legal studies in 2005 further reflects his pattern of intellectual curiosity and his willingness to pursue structured learning when he believes it may be useful.

From a release perspective, a person with George's educational history - multiple degrees, military service, and a consistent record of intellectual engagement - presents as stable, capable, and responsible. His academic achievements also support the conclusion that he has the capacity to follow structured expectations and comply with conditions of release.

George's educational background strengthens his mitigation profile: it demonstrates perseverance in the face of early adversity, high intelligence and discipline, service to his country, and a lifelong pattern of responsible, goal-oriented behavior. These are all factors that favor a measured consideration of release on appropriate conditions and support mitigation at sentencing.

<u>Military Service</u>

In 1975, George joined the United States Navy through a special program that required a short period of active duty followed by several years of reserve service. He completed his initial training in Orlando, Florida, before transferring to San Diego, where he fulfilled the remainder of his reserve obligations. His service consisted of the standard reserve schedule: one weekend each month and two weeks every summer.

George served as a hospital corpsman, and he excelled in his training - finishing first in his corpsman class of fifty plus. He enjoyed his time in the Navy and looks back on it as a positive and meaningful chapter of his life. In 1981, he received an honorable discharge with the rank of Hospitalman E-3.

*Analysis*

George's military service contributes significantly to his positive personal history and directly informs his "history and characteristics" under 18 U.S.C. § 3553(a)(1). Completing both active duty and reserve obligations reflects commitment and discipline, as well as the capacity to function well in structured environments. His achievement in finishing first in his corpsman training class demonstrates strong aptitude and responsibility.

As a hospital corpsman, George served in a role that required compassion, attention to detail, and the ability to assist others in medical settings, which are traits that speak to reliability and character. His honorable discharge further supports the conclusion that he performed his duties faithfully and without disciplinary issues.

From a release standpoint, individuals with successful military service often present as dependable and compliant. George's record shows that he can follow rules, maintaining schedules, and meeting obligations - qualities that support the conclusion that he can comply with supervision or release conditions if imposed.

Work History

George has spent most of his adult life as a small business owner and operator. In the late 1970s, he and his partner, Robert, opened their first business, a store. Over the next several decades, George and Robert continued expanding their business interests. In 2007, they opened a second store, and in 2016, George took over a third store after it had closed under previous ownership. Today, all three stores remain in operation. Between the three locations, George employs about twenty people. George remains actively involved in the business, although he now relies on  trusted manager Stephan to help him with day-to-day operations.

*Analysis*

George's employment history represents a long, stable record of entrepreneurship and lawful business operation. For nearly five decades, he has operated brick-and-mortar businesses that have remained open, regulated, and staffed. This is a meaningful component of his history and characteristics because it demonstrates sustained productivity, community engagement, and responsibility.

George's ability to open and manage multiple stores - surviving zoning disputes, economic fluctuations, and the challenges or running niche retail establishments - illustrates determination, financial discipline, and adaptability. These are markers of stability and personal structure, qualities that strongly support rehabilitative potential and the likelihood of future law-abiding behavior.

16

The longevity and scale of his business operations show that he is not only self-sufficient but also contributes to the livelihood of others. This level of civic and economic participation is relevant mitigation because it demonstrates that George functions as a productive member of the community and has maintained legitimate employment for decades.

In terms of release conditions, his long-term operation of stable, local businesses, with established employees and a functioning management structure, indicates strong community ties and a predictable daily routine. His reliance on a manager also reduces concerns about operational disruption during any period of supervised release.

George's employment background shows a long-established pattern of legal, sustained entrepreneurship that includes substantial community investment. These qualities support mitigation and favor measured consideration of release on appropriate conditions, given his demonstrated history of responsibility and stability.

<u>Physical Health</u>

George has generally enjoyed good health for most of his life, but in recent years he has dealt with several significant medical conditions.

A few years ago, George was diagnosed with sleep apnea. He does not have his CPAP machine in the Pinellas County Jail. He has not had it since his arrest and incarceration.

In 2016, he was diagnosed with throat cancer. He underwent six weeks of radiation treatment, and although the treatment was unsuccessful, it left lasting effects. Much of his saliva production was destroyed, and the structure of his throat and mouth changed after radiation, leaving him with permanent difficulties in tasting and swallowing. Eating now requires constant small sips of fluid, except when he has very soft foods, and this is simply part of his daily routine.

In 2019, George experienced serious heart issues and underwent a quadruple bypass (CABG). Since then, he has taken medications to support his heart function, including a daily low-dose aspirin and metoprolol. He also takes Losartan for high blood pressure, along with medications for cholesterol management and acid reflux.

Despite these conditions and the list of prescription medications he takes, George reports that he feels well on a day-to-day basis. He does not live with chronic pain, and he considers his overall health to be good for his age.

*Analysis*

George's physical health history highlights several factors that carry mitigation weight and should be considered in evaluating both sentencing and

18

custodial decisions. The combination of cancer-related complications, major cardiac surgery, and ongoing cardiovascular and metabolic management indicates that George is an older individual with complex medical needs. His medical condition forms an important part of his request for release, especially where pretrial incarceration may impose hardship disproportionate to that experienced by a younger or healthier defendant.

The effects of his throat cancer treatment - permanent loss of saliva production and chronic swallowing difficulties - are not transient symptoms but enduring disabilities that affect his daily functioning. These conditions increase his reliance on consistent access to fluids and non-irritating foods, something that can present challenges in a custodial setting.

George's history of a quadruple bypass and his daily use of medications for heart regulation and blood pressure further underscore that he is a person who requires ongoing medical monitoring. Although he reports feeling healthy, his stability depends on uninterrupted access to medical care, regular medication, and a health-conscious environment.

From a pretrial release perspective, the presence of substantial medical needs paired with his overall stability can support arguments that George is a low risk for non-compliance and would benefit from continued medical oversight in the community. His medical history suggests vulnerability rather than danger, and his

compliance with long-term treatment plans shows that he can follow structured routines and medical guidance.

George's physical health background reflects a man who has undergone serious medical interventions, whose conditions are well-managed but significant, and whose health profile favors alternatives to extended pretrial detention. The combination of age, cardiac history, and cancer-related deficits supports mitigation and may warrant a measured consideration of pretrial release on appropriate conditions.

<u>Mental Health</u>

George has lived with depression for most of his adult life. He was first diagnosed in 1995, and since then he has consistently taken prescribed medication to manage his symptoms. He currently takes two medications - bupropion and mirtazapine - and feels they keep his depression under control period he has never participated in formal counseling or therapy, although he is open to it if a professional believes it would be helpful and does not object should this be part of his pretrial release.

Some of George's emotional struggle is tied to the losses he has endured. In the span of two years, in 2023 and in 2024, he lost both his mother and his father. George has lost several people close to him to suicide, including his brother, a nephew, and several close friends. Those losses, layered on top of earlier tragedies

and losses, have weighed heavily on him. George, in the twilight of his life, thinks about those he has lost often.

Despite the long history of depression and the trauma associated with losing so many loved ones under tragic circumstances, George believes the medication he takes keeps him stable. He remains open and willing to seek counseling if it is ever recommended or ordered as part of pretrial release.

*Analysis*

George's mental health history presents several meaningful mitigation themes. First, he has a longstanding, medically documented, mental health condition that predates the current case by decades. His depression is not situationally fabricated or exaggerated for legal purposes and reflects a chronic medical issue that he has responsibly managed through consistent adherence to prescribed medication. His mental and emotional history is directly relevant to understanding his background and personal characteristics, as well as the vulnerabilities that shape his behavior and decision making, and how pretrial release would benefit his mental health.

Second, the cumulative grief and trauma he has experienced - losing his partner a decade ago, both parents a few years ago, and multiple close family members and friends to suicide - create a psychological landscape marked by unresolved loss. The absence of counseling is not an indicator of resistance but

rather an unmet clinical need. Importantly, he expresses a clear willingness to participate in counseling if recommended or ordered under pretrial release. This receptivity highlights great rehabilitative potential.

From a pretrial release perspective, George's stable adherence to prescribed medication and the absence of untreated acute symptoms indicate emotional stability. His openness to further treatment, coupled with decades of medication compliance, weighs in favor of reliability and continued mental stability if he is released.

George's mental health history shows a person who has managed a chronic condition responsibly, who has endured significant trauma without externalizing it in harmful ways, and who remains open to treatment that could improve his long-term well-being. These factors support both sentencing mitigation and measured consideration of release with appropriate safeguards in place.

<u>Substance Use</u>

In the early 1980s, George went through a period in which he experimented with drugs. He was not a daily user, but he used it often enough that he eventually realized it was becoming a problem. After about a year, he decided on his own that it needed to stop. Without treatment, counseling, or outside pressure, he quit using illegal substances altogether.

George has always used alcohol sparingly and only in social settings. Drinking has never played a significant role in his life, nor has it ever escalated into misuse or dependency.

When George's significant other, Robert, passed away in 2007, he struggled with sleep. A doctor prescribed him sleeping medication, but it left him feeling groggy and hungover in the mornings. Searching for an alternative, he discovered that marijuana helped him fall asleep without the unpleasant side effects. He has used marijuana nightly since then, not for recreation or intoxication, but simply to help him sleep period he continued this routine up until his arrest.

George does not believe he needs treatment or counseling to abstain from marijuana use, as he views this use as limited, purposeful, and within his control period however, he is willing to undergo a drug evaluation or participate in treatment if it is determined to be appropriate under pretrial release supervision.

*Analysis*

George's substance-use history shows long-term stability and self-regulation. His experimentation with illegal substances occurred more than four decades ago, during his youth, and he stopped both substances entirely without treatment, pressure, or legal consequences. This demonstrates the level of internal control and decision-making that weighs in favor of rehabilitation potential and does not indicate a pattern of substance dependency. This history is relevant

23

because it shows that any past drug use is remote in time and does not meaningfully inform his current risk profile while on pretrial release.

George's alcohol use is limited, social, and non-problematic. There is no history suggesting alcohol misuse, addiction, or related criminal behavior. This absence of alcohol-related issues supports the conclusion that he does not present concerns related to substance-driven instability.

The only ongoing substance use is George's nightly use of marijuana, which began as a coping mechanism and sleep aid after the death of his partner in 2007. Importantly, this is not recreational or compulsive use. It is a substitute for a prescribed sleep aid that caused adverse side effects. From a mitigation standpoint, this is significant because it reflects symptom management rather than drug-seeking behavior. His willingness to stop if required, and his openness to evaluation or treatment while on pretrial release, further underscores his cooperation and capacity for compliance.

For bail considerations, George's substance use pattern does not indicate risk of danger or ongoing impairment. His use is stable, controlled, and limited to marijuana for sleep - something he indicates he can discontinue while on pretrial release. His decades-long abstinence from all other substances reinforces the conclusion that he does not display behaviors associated with addiction or instability.

Overall, George's history reflects remote, self-resolved youthful drug use, non-problematic alcohol use, and purpose-driven marijuana use tied to grief and sleep difficulty rather than addiction. These elements collectively support mitigation under the history and characteristics of the defendant and suggest that he is unlikely to pose risks that would undermine conditions of pretrial release.

<u>Prior Sentences</u>

George has only one prior criminal conviction. In 2018, he was convicted of a non-violent misdemeanor related to a worker's compensation insurance violation. He received a three-year term of summary probation, which he completed without difficulty. During that period, he followed every condition the court imposed, including paying his fine and restitution. While on supervision, he had no violations, responded appropriately to all requirements, and ultimately successfully terminated from the probation program. His experience on supervision shows that he can meet expectations, remaining compliant, and resolving matters responsibly when the court places obligations on him. This bodes well for pretrial release supervision.

## V.    Review of the Magistrate Judge's Detention Order

<u>Standard of Review</u>

Title 18, United States Code, Section 3145(a) provides for district court review of a magistrate judge's order of pretrial release or detention. The Eleventh

Circuit Court of Appeals has held that, in reviewing a magistrate judge's detention order, the district court must "conduct an *independent* review of the case, enter its own findings in writing, and set forth the reasons supporting its decision, making provisions as set forth in subsection (i)(1) through (4) [of section 3145]." *United States v. Hurtado*, 779 F.2d 1467, 1480 (11th Cir. 1985) (emphasis in original); *see also United States v. King*, 849 F.2d 485, 489-90 (11th Cir. 1988) (interpreting *Hurtado* to require a *de novo* review of the order of detention or pretrial release).

## The Applicable Law

Under the Bail Reform Act of 1984, a judicial officer is to detain a defendant pending trial only if "the judicial officer finds that *no* condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1) (emphasis added).

In the instant case, the rebuttable presumptions in favor of detention, which are set forth in subsections 3142(e)(2) and (3), do not apply. As a result, the government bore the burden of proving a) by clear and convincing evidence that the Defendant was a danger to the community and/or b) by a preponderance of the evidence that the Defendant was a risk of flight. *United States v. Medina*, 775 F.2d 1398, 1405 (11th Cir. 1985); *United States v. King*, 849 F.2d 485, 488-89 (11th Cir. 1988.)

It failed to prove either at the detention hearing in this case.

Section 3142 provides that the factors the district court is to consider in making the pretrial release or detention determination are:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; and

(2) the weight of the evidence against the person; and

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

<u>The Instant Case</u>

As to the weight of the evidence against him, the government always believes the cases it brings are strong.[1] But as section 3142 explicitly points out,

---

[1] Although the Defendant has not yet received discovery, he is certain the Government will argue its case is strong. The Defendant reminds the Court, however, that the First Amendment requires proof of subjective *mens rea* in true threat prosecutions, while a recklessness standard satisfies

the Defendant enjoys a presumption of innocence at this stage of the case. 18 U.S.C. § 3142(g) (stating "Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

Turing to the next prong of section 3142(g), the Defendant's history and characteristics (as discussed earlier in this motion) demonstrate that he will not be a flight risk or a danger to the community if released.

Finally, as to "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," the Defendant poses no danger whatsoever. Whatever caused him to lash out in this case has now been overwhelmed by the consequences of his actions. The Defendant is an elderly man with serious health issues who has one instance of a minor white collar crime history unrelated to violence.

In this case, the district court, moreover, could impose pretrial release conditions that would restrict the Defendant's ability to use a computer, which would curtail any fears the Defendant would continue his previous online conduct.

In the end, conditions of release clearly exist that can ensure the Defendant's attendance at future court hearings and ensure the safety of the community upon

---

constitutional requirements. *Counterman v. Colorado*, 600 U.S. 66 (2023)(explaining that while true threats remain unprotected speech, "the First Amendment may still demand a subjective mental-state requirement, shielding some true threats from liability"). The Court centered its decision on preventing the chilling effect that could result from purely objective standards and aimed to balance protection from threatening speech with protection of free expression. *See Exhibit A.*

his release. The government failed to carry its burden to show otherwise. *Compare United States v. Bernard L. Madoff*, 586 F.Supp.2d 240 (S.D. N.Y. 2009) (finding that a combination of conditions of release could reasonably assure the defendant's appearance in court and the safety of the community in securities fraud case despite the defendant's possession of substantial assets and an extraordinary alleged loss amount stemming from the offense.

<u>Proposed Conditions of Release</u>

The Defendant proposes that the following conditions of pretrial release be imposed:

a) a secured bond in an amount deemed reasonable by the district court; and

b) home detention and satellite electronic monitoring; and

c) surrender of his passport; and

d) execution of a Fourth Amendment waiver permitting a search of his residence or businesses; and

e) third party custodian; and

f) other conditions that the district court finds just and appropriate.

## XI.    **Position of the Government**

In accordance with local rules, undersigned counsel ascertained the position of the government as to this motion.

The government objects to pretrial release.

## XII.   Transcripts of Court Appearances, Including Initial Detention Hearing

The transcripts of the Defendant's prior court appearances in the Southern District of California, San Diego Division, including his initial detention hearing, are attached to this motion as ***Exhibits B, C, and D.***

## XIII. Request

The Defendant respectfully urges the district court to grant the Defendant's motion or grant a hearing on the merits of the motion so any concerns the district court has can be addressed in real time with relevant physical evidence and testimonial evidence from proposed third party custodians and other witnesses.

A denial of this motion without a hearing is unjust because the Defendant has raised a myriad of issues and presented significant evidence that were not raised at his initial detention hearing that directly address the Magistrate's concern of danger to the community.

## **<u>CONCLUSION</u>**

WHEREFORE, the Defendant, GEORGE RUSSELL ISBELL, by and through the undersigned counsel respectfully requests this Honorable Court grant the stated relief and/or any other relief this Honorable Court deems appropriate.

Respectfully submitted,

<u>By: /s/ Mark J. O'Brien</u>
Mark J. O'Brien, Esquire
Florida Bar No.: 0160210
511 West Bay Street
Suite 330
Tampa, Florida 33606
T:      (813) 228-6989
E:      mjo@markjobrien.com

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY on December 5, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will then send notice of electronic filing to all counsel of record.

By: <u>/s/ Mark J. O'Brien</u>
Mark J. O'Brien, Esquire
