UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA :
:
:
v. : Case No.: 8:25-CR-498-JLB-AEP
:
:
GEORGE RUSSELL ISBELL, JR :
_________________________________:

**DEFENDANT GEORGE RUSSELL ISBELL JR'S SENTENCING MEMORANDUM**

COMES NOW, the Defendant, GEORGE RUSSELL ISBELL, JR., by and through his undersigned counsel, and files this his sentencing memorandum and in support states as follows:

Introduction

The Defendant will soon stand in judgment before this Honorable Court for those crimes he committed - and more importantly for those crimes for which he has accepted full responsibility for committing.

The Defendant nor his counsel will minimize the negative effect the Defendant's criminal conduct has had on his victims, his community, the judicial system, state and federal law enforcement agencies, his family, his friends, and himself.

The Defendant will offer an allocution and when he does, he will blame only himself. There is no place in the United States of America for threatening the life of another person because you disagree with the views of another person.

The question that must be answered at sentencing is therefore this: why would a person, now a seventy-year-old man, do such a horrible thing to another? The answer, as often is the case when resolved in this building, is complicated. Whether the Defendant would have *actually* carried out his threats is irrelevant under the law at this point in his case. But assuming he would not have, and the evidence supports this position, why did the Defendant place two of his fellow human beings in a position to feel he would?

The answer is, as stated above, complicated. The Defendant is a lot of things, like a lot of Americans. He is elderly. He is a veteran. He is a small business owner. He was with the same person in a committed relationship for decades. He has family and friends who love and support him. He is in nearly all respects the epitome of the American Dream.

But the Defendant is also gay and therefore deemed lessor by some. This has eaten at his very soul for his entire life. With all that he has accomplished, why should his life's value be diminished by others? If he was heterosexual, would he not be viewed differently by some? This statement, by the way, is **not** specific to his victim. The Defendant has never met his victim. And he does not know how his

victim personally views him (aside from likely being very angry at his actions in this case – which is justified).

This is instead a larger issue, irrelevant to his victim, and one that must be viewed from a macro scale over a span of decades. The feeling of being less to others simply because of who he was born to be, is something the Defendant has faced, has struggled with, and has dealt with his entire life.

Years of frustration, and a healthy dose of cable news punditry and online media consumption, led the Defendant to cross the line and threaten another. Like most who engage in hateful rhetoric, it is a sugar high. It fills you up for a moment. And then it leaves you but a moment later feeling worse than you did before you began.

In the Defendant's case it left him sitting and reflecting on his actions in the Pinellas County Jail for months. He knows what he did was morally reprehensible. He knows it was legally wrong.

Thus, this sentencing memorandum does not exculpate the Defendant, but it does mitigate against the punishment the government is requesting. The Defendant, an old, unhealthy man, does not need any more prison time.

He is chastened.

He is humbled.

And he will never violate the law again.

## I. Presentence Investigation Report

The Defendant has no objections to the factual accuracy of the pre-sentence investigation report.

The Defendant agrees with the well-reasoned and comprehensive position of United States Probation and therefore has no objections to the legal accuracy of the pre-sentence investigation report.

### Sentencing Process

In order to arrive at a sentence that is sufficient but not greater than necessary, and to comply with the purposes set forth in paragraph two of Title 18 United States Code Section 3553(a), the Defendant understands this Honorable Court will first calculate the Defendant's federal sentencing guideline sentence range, next consider any departures based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1, and, finally, consider whether the sentence imposed should be different from either the federal sentencing guideline sentence or the departure sentence (if any), after considering the factors set forth in 18 United States Code Section 3553(a).

- As indicated above, the advisory federal sentencing guideline range as calculated by United States Probation is accurate.

- It is unlikely there will be any upward or downward departure motions based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1 at this time.
- In this submission, the Defendant posits there is a basis for a downward variance and discusses this request in the next section.

## II. Downward Variance Request

There is no doubt the Defendant committed the crimes charged in the indictment. The Defendant has accepted responsibility by pleading guilty to each charge in the indictment. The Defendant knows, and most importantly accepts, that now is the time that he must be punished for his criminal actions.

But as this Honorable Court certainly knows better than anyone, a federal sentencing is not designed to punish alone. If so, there would be no need for a presentence investigation report, sentencing submissions by the parties and a sentencing hearing with argument and allocution. Instead, this Honorable Court would simply read the presentence investigation report's section on the federal sentencing guideline and via written order impose an imprisonment sentence within the accepted guideline range. It would be like 2004 and before, all over again - quick, painless, and expedient - for everyone but the Defendant.

But the Defendant, like all other federal defendants waiting to see how much of their lives will be taken[1] from them at sentencing, is exactly the person for whom an individualized sentencing is designed. The Defendant is more than just his criminal actions in this case. The totality of the Defendant's life, not just his criminal actions, deserves to be heard and considered.

It is the Defendant's belief that a guideline imprisonment sentence is unreasonable and thus greater than necessary under the law. The Defendant offers the following mitigation in support of his request for a downward variance.

<u>Title 18 United States Code Section 3553(a)</u>

The Title 18 United States Code Section 3553(a) factors that a sentencing judge must take into equal consideration to the federal sentencing guidelines are as follows:

- The nature and circumstances of the offense and the history and characteristics of the defendant; 18 United States Code Section 3553(a)(1); and

- The need for the sentence imposed; 18 United States Code Section 3553(a)(2); and

    - to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
    - to afford adequate deterrence to criminal conduct.
    - to protect the public from further crimes of the defendant.
    - to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

[1] Due to his criminal conduct.

- The kinds of sentences available; 18 United States Code Section 3553(a)(3); and

- The need to avoid unwarranted disparity among defendants with similar records and similar crimes; 18 United States Code Section 3553(a)(6); and

- The need to provide restitution to any victims of the offense. 18 United States Code Section 3553(a)(7).

Prior to the United States Supreme Court decisions in *United States v. Booker*, 543 U.S. 220, 245-67 (2005), *Rita v. United States*, 127 S.Ct. 2456 (2007), *Kimbrough v. United States*, 128 S.Ct. 558 (2007), and *Gall v. United States*, 552 U.S. 38, 53 (2007), the federal sentencing guidelines were mandatory, not advisory, on a federal sentencing judge.

As we all know, because of the above seminal cases, the federal sentencing guidelines are now advisory in nature and equal in weight to the Title 18 United States Code 3553(a) factors.[2]

**The History and Characteristics of the Defendant.**
**18 United States Code Section 3553(a)(1)**

**The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**
**18 United States Code Section 3553(a)(2)**

[2] Undersigned counsel is aware this Honorable Court is well-versed in this area of the law and will now move forward in this sentencing memorandum to an application of fact and law analysis as a result.

## Personal and Family History

George Russell Isbell, Jr., was born on August 8, 1956, in St. Louis, Missouri, to Margaret and George Isbell. He has five siblings - two brothers and two sisters. His early childhood was rooted in Saint Louis, Missouri, until the family relocated within Missouri for a few years, eventually settling in Ennis, Texas, when George was nine years old. George remembers his upbringing as warm, stable, and loving. His parents were not wealthy, but the family always had what they needed - food on the table, clothes to wear, a safe home, and love and affection for one another. Summers often included inexpensive family vacations, usually to visit relatives in Texas or Missouri, and those trips remain meaningful memories for George.

George describes his relationships with his siblings as typical - some arguments and tensions here and there over the years about topics no one can now recall, but nothing that overshadowed the closeness of the family as a whole. His mother worked as a telephone operator and factory worker, and his father installed equipment for Western Bell, which is how the two of them met. George was extremely close to his mother and believes he may have been her favorite, though he would never tell that to his siblings. Some of his fondest memories come from the bowling leagues they participated in together. George's mother was an excellent bowler, and he cherished the time they spent as a team.

In 1975, at age 18, George moved to San Diego, California, after joining the Navy. A year later, he met Robert Clark, the man who would become the love of his life. They shared a home and a committed relationship from 1975 until Robert's death in 2007. Robert, who was ten years older than George, died from cancer linked to Agent Orange exposure during his military service in Vietnam. Their life together was fairly normal, save the difficulties of being in a same-sex relationship, but George describes the relationship as deeply loving and solid. George was and remains devastated by Robert's death.

Today, George still grieves the recent deaths of his parents and his life partner. Although he has become estranged from some of his siblings, he remains very close to his sister Linda. He also maintains strong ties with Robert's sister and one of Robert's brothers. George has built meaningful friendships in the greater San Diego area as well, including a close friendship with his store manager.

*Analysis*

George's personal and family history presents a picture of someone who grew up in a stable, loving household and maintained long-term, meaningful relationships throughout his life. Under 18 U.S.C. § 3553(a)(1), his background reflects strong family values, steady emotional development, and a consistent ability to form deep, lasting bonds - all of which bear on his character and the likelihood of law-abiding behavior moving forward.

George's early years show a grounded childhood without trauma, neglect, or instability. The fact that he speaks warmly of his upbringing, remembers positive family traditions, and still carries fond memories of activities with his mother underscores a foundation of emotional security. This type of background correlates with a capacity for stable relationships, routine, and consistent behavior - qualities relevant to sentencing mitigation.

George's decades-long partnership with Robert is especially significant. Maintaining a committed relationship for more than thirty years demonstrates loyalty, emotional maturity, and stability. His enduring connections with Robert's family even after Robert's death reflect the same qualities. The grief he continues to experience over Robert's passing, and more recently his parents' deaths, adds context to his emotional landscape and helps explain some of the weight he carries today.

Although he is not close with some of his siblings, George still has strong support from others, particularly his sister Linda. He also has close connections through his business, including his strong friendship with his store manager. These relationships suggest he has ongoing community ties and a supportive network - factors that are relevant to the history and characteristics inquiry.

George's network of supportive family and friends reinforces the idea that he has anchors in the community and people who care about his well-being. That

stability aligns with the traits of someone capable of complying with conditions of supervision.

George's personal history reflects a life shaped by steady relationships, emotional stability, and enduring family bonds. These qualities meaningfully support sentencing mitigation.

Educational History

In 1974, George graduated from Ennis High School in Ennis, Texas. He remembers being bullied at times because he was suspected as being gay, but the bullying was never constant or severe, and he still looks back on high school as a generally positive experience. He had friends, found his place socially, and especially thrived in the band. He played both the trumpet and the French horn, and he excelled to the point of earning numerous awards for his musical talent.

After high school, George joined the United States Navy, a step that ultimately led him to San Diego, California. During this period, he began pursuing a long-held dream of becoming a doctor. In 1980, he earned a bachelor's degree in biochemistry from the University of California - San Diego. Although he initially planned to continue to medical school, his life took a different direction once he and his partner, Robert, decided to go into business together.

Years later, in 1990, George returned to school and earned a Bachelor of Arts degree in interior design from the Design Institute of San Diego. While he did

not turn this degree into a formal career, he found practical ways to use this training. He has helped friends with design projects and applied his design skills to the layout and presentation of his own stores.

In 2005, George also completed a year of on-line legal studies through Concord Law School (now known as Purdue Global Law), a Los Angeles, California, based institution. He ultimately withdrew from the program after realizing it would not assist him overall in his business life as he originally suspected.

*Analysis*

George's educational background reflects intellectual ability and a consistent commitment to self-improvement - factors that carry substantial mitigation value. His experiences in high school, including coping with bullying related to his sexual orientation, show early adversity that he navigated successfully, maintaining stability and excelling in extracurricular activities. This history underscores qualities of perseverance and emotional maturity relevant to 18 U.S.C. § 3553(a)(1)’s consideration of personal history and characteristics.

George's academic achievements demonstrate strong cognitive capacity and discipline, and the pursuit of a medical career, even though he ultimately chose a different path, is evidence of ambition and long-term goal setting.

George's decision later in life to return to school and earn a second bachelor’s degree in interior design reflects lifelong learning and adaptability. Even though he did not pursue interior design professionally, he used that knowledge productively to improve his businesses and assist others. This shows that he approaches education with sincerity and applies what he learns in constructive ways.

George’s brief enrollment in online legal studies in 2005 further reflects his pattern of intellectual curiosity and his willingness to pursue structured learning when he believes it may be useful.

A person with George’s educational history - multiple degrees, military service, and a consistent record of intellectual engagement - presents as stable, capable, and responsible. His academic achievements also support the conclusion that he has the capacity to follow structured expectations and comply with supervision conditions.

George’s educational background strengthens his mitigation profile: it demonstrates perseverance in the face of early adversity, high intelligence and discipline, service to his country, and a lifelong pattern of responsible, goal-oriented behavior.

These are all factors that support mitigation at sentencing.

<u>Military Service</u>

In 1975, George joined the United States Navy through a special program that required a period of active duty followed by several years of reserve service. He completed his initial training in Orlando, Florida, before transferring to San Diego, California, where he fulfilled the remainder of his reserve obligations. His service consisted of the standard reserve schedule: one weekend each month and two weeks every summer.

George served as a hospital corpsman, and he excelled in his training - finishing first in his corpsman class. He enjoyed his time in the Navy and looks back on it as a positive and meaningful chapter of his life. In 1981, he received an honorable discharge with the rank of Hospitalman E-3.

*Analysis*

George's military service contributes significantly to his positive personal history and directly informs his history and characteristics under 18 U.S.C. § 3553(a)(1). Completing both active duty and reserve obligations reflects commitment and discipline, as well as the capacity to function well in structured environments. His achievement in finishing first in his corpsman training class demonstrates strong aptitude and responsibility.

As a hospital corpsman, George served in a role that required compassion, attention to detail, and the ability to assist others in medical settings, which are

traits that speak to reliability and character. His honorable discharge further supports the conclusion that he performed his duties faithfully and without disciplinary issues.

Individuals with successful military service often present as dependable and compliant. George's record shows that he can follow rules, maintaining schedules, and meeting obligations - qualities that support the conclusion that he can comply with community supervision if imposed.

## Work History

George has spent most of his adult life as a small business owner and operator. In the late 1970s, he and his partner, Robert, opened a theater, and the two of them ran it for more than two decades. When the theater closed in 2000, George and Robert shifted their focus to retail, purchasing property and opening a store in San Diego, California.

Over the next several years, George and Robert continued expanding the business. In 2007, they opened a second store, and in 2016, George took over a third store after it had closed under previous ownership. Today, all three stores remain in operation. Between the three locations, George employs around twenty people. George remains actively involved in the business, and he relies on a trusted manager to help him with day-to-day operations.

*Analysis*

Georgia's employment history represents a long, stable record of entrepreneurship and lawful business operation. For nearly five decades, he has operated brick-and-mortar businesses that have remained open, regulated, and staffed. This is a meaningful component of his history and characteristics under 18 U.S.C. § 3553(a)(1) because it demonstrates sustained productivity, community engagement, and responsibility.

George's ability to open and manage multiple stores - surviving zoning disputes, economic fluctuations, and the challenges of running niche retail establishments - illustrates determination, financial discipline, and adaptability. These are markers of stability and personal structure, qualities that strongly support rehabilitative potential and the likelihood of future law-abiding behavior.

George also employs approximately twenty people across his three stores. The longevity and scale of his business operations show that he is not only self-sufficient but also contributes to the livelihood of others. This level of civic and economic participation is relevant mitigation because it demonstrates that George functions as a productive member of the community and has maintained legitimate employment for decades.

George's long-term operation of stable, local businesses, with established employees and a functioning management structure, indicates strong community

ties and a predictable daily routine. His reliance on a manager also reduces concerns about operational disruption during any period of community supervision.

George's employment background shows a long-established pattern of legal, sustained entrepreneurship that includes substantial community investment. These qualities support mitigation and favor measured consideration of community supervision, given his demonstrated history of responsibility and stability.

<u>Physical Health</u>

George enjoyed good health for most of his early life, but in recent years he has dealt with several significant medical conditions. In 2016, he was diagnosed with throat cancer. He underwent six weeks of radiation treatment, and although the treatment was successful, it left lasting effects. Much of his saliva production was destroyed, and the structure of his throat and mouth changed after radiation, leaving him with permanent difficulties in tasting and swallowing. Eating now requires constant small sips of fluid, except when he has very soft foods.

In 2019, George experienced serious heart issues and underwent a quadruple bypass (CABG). Since then, he has taken medications to support his heart function, including a daily low-dose aspirin and metoprolol. George was recently scheduled to have heart stents placed, but the stent placement procedure has been cancelled

for now. Being in pretrial detention for so long has also taken a toll on his cardiac health.

George also takes Losartan for high blood pressure, along with medications for cholesterol management and acid reflux.

Despite his medical conditions and the list of prescription medications he takes, George reports that he generally feels okay on a day-to-day basis. He does not live with severe chronic pain, and he considers his overall health to be decent for his age and medical condition.

*Analysis*

George's physical health history highlights several factors that carry mitigation weight and should be considered in evaluating sentencing and custodial decisions. The combination of cancer-related complications, major cardiac surgery, and ongoing cardiovascular and metabolic management indicates that George is an older individual with complex medical needs. Under 18 U.S.C. § 3553, his medical conditions form an important part of his history and characteristics and the need for medical care, especially where incarceration may impose hardship disproportionate to that experienced by a younger or healthier defendant.

The effects of his throat cancer treatment - permanent loss of saliva production and chronic swallowing difficulties - are not transient symptoms but enduring disabilities that affect his daily functioning. These conditions increase his

reliance on consistent access to fluids and non-irritating foods, something that can present, and has presented, challenges in a custodial setting.

George's history of a quadruple bypass and his daily use of medications for heart regulation and blood pressure further underscore that he is a person who requires ongoing medical monitoring. Although he reports feeling healthy, his stability depends on uninterrupted access to medical care, regular medication, and a health-conscious environment.

From a release perspective, the presence of substantial medical needs paired with his overall stability can support arguments that George is a low risk for non-compliance and would benefit from continued medical oversight in the community. His medical history suggests vulnerability rather than danger, and his compliance with long-term treatment plans shows that he can follow structured routines and medical guidance.

George's physical health background reflects a man who has undergone serious medical interventions, whose conditions are well-managed but significant, and whose health profile favors alternatives to extended incarceration. The combination of age, cardiac history, and cancer-related deficits supports mitigation and warrants consideration of release on appropriate conditions.

Mental Health

George has lived with depression for most of his adult life. He was first diagnosed in 1995, and since then he has consistently taken prescribed medication to manage his symptoms. He currently takes two medications - bupropion and mirtazapine - and feels they keep his depression under control. He has never participated in formal counseling or therapy, although he is open to it if a professional believes it would be helpful.

Some of George's emotional struggle is tied to the losses he has endured. In the span of just a couple of years, 2023 and 2024, he lost both his mother and his father. Those losses, layered on top of earlier tragedies, have weighed heavily on him. George has lost several people close to him to suicide, including his brother, a nephew, and several close friends. These losses left their mark on him, and he still thinks about them often.

George also wonders if his depression could be connected to his brief use of methamphetamine in the 1980s. A doctor has never told him this, but it is a lingering curiosity in his mind.

Despite the long history of depression and the trauma associated with losing so many loved ones under tragic circumstances, George believes that the medication he takes keeps him stable. He remains open and willing to seek counseling if it is ever recommended.

*Analysis*

George's mental health history presents several meaningful mitigation themes. First, he has a longstanding, medically documented, mental health condition that predates the current case by decades. His depression is not situationally made up or exaggerated for legal purposes and reflects a chronic medical issue that he has responsibly managed through consistent adherence to prescribed medication. Under 18 U.S.C. § 3553(a)(1), his mental and emotional history is directly relevant to understanding his background and personal characteristics, as well as the vulnerabilities that shape his behavior and decision making.

Second, the cumulative grief and trauma he has experienced - losing his life partner and both parents within a short period and losing multiple close family members and friends to suicide - create a psychological landscape marked by unresolved loss. The absence of counseling is not an indicator of resistance but rather an unmet clinical need. Importantly, he expresses a clear willingness to participate in counseling if recommended. This receptivity highlights great rehabilitative potential, a point that aligns with 18 U.S.C. § 3553(a)(2)(D), which focuses on treatment needs and the ability to benefit from structured mental health support.

George’s speculation about past drug use triggering depression is not a clinical finding but reflects insight and self-reflection. It demonstrates that he thinks critically about his emotional health and is not dismissive of mental health issues. This level of awareness can support both mitigation and the argument that he can engage meaningfully in treatment.

George's mental health history shows a person who has managed a chronic condition responsibly, who has endured significant trauma without externalizing it in harmful ways, and who remains open to treatment that could improve his long-term well-being. These factors support sentencing mitigation and consideration of a sentence of community supervision.

Substance Use

In the early 1980s, George went through a period in which he experimented with narcotics. He was not a daily user. After about a year, he decided on his own that it needed to stop. Without treatment, counseling, or outside pressure, he quit using narcotics altogether.

George has always used alcohol sparingly and only in social settings. Drinking has never played a significant role in his life, nor has it ever escalated into misuse or dependency.

When George’s significant other, Robert, passed away in 2007, he struggled with sleep. A doctor prescribed him sleeping medication, but it left him feeling

groggy and slow moving in the mornings. Searching for an alternative, he discovered that medical marijuana helped him fall asleep without the unpleasant side effects. He has used marijuana nightly since then, not for recreation or impairment, but simply to help him sleep. He continued this routine up until his arrest, but obviously he has abstained during his extended period of pretrial detention.

George does not believe he needs treatment or counseling to abstain from marijuana use, as he views this use as limited, purposeful, and within his control. However, he is willing to undergo a drug evaluation or participate in treatment if it is determined to be appropriate.

*Analysis*

George's substance-use history shows long-term stability and self-regulation. His experimentation with narcotics occurred more than four decades ago, during his youth, and he stopped both substances entirely without treatment, pressure, or legal consequences. This demonstrates the level of internal control and decision-making that weighs in favor of rehabilitation potential and does not indicate a pattern of substance dependency. Under 18 U.S.C. § 3553(a)(1), this history is relevant because it shows that any past drug use is remote in time and does not meaningfully inform his current risk profile.

George's alcohol use is limited, social, and non-problematic. There is no history suggesting alcohol misuse, addiction, or related criminal behavior. This absence of alcohol-related issues supports the conclusion that he does not present concerns related to substance-driven instability.

The only ongoing substance use is George's nightly use of marijuana, which began as a coping sleeping mechanism after the death of his partner in 2007. Importantly, this is not recreational or compulsive use; it is a substitute for a prescribed sleep aid that caused adverse side effects. From a mitigation standpoint, this is significant because it reflects symptom management rather than drug-seeking behavior. His willingness and ability to stop when required, and his openness to evaluation or treatment, further underscores his cooperation and capacity for compliance.

For sentencing considerations, George's substance use pattern does not indicate risk of danger or ongoing impairment. His decades-long abstinence from all other substances reinforces the conclusion that he does not display behaviors associated with addiction or instability.

Overall, George's history reflects remote, limited and self-resolved youthful drug use, non-problematic alcohol use, and purpose-driven marijuana use tied to grief and sleep difficulty rather than addiction. These elements collectively support mitigation under the history and characteristics of the defendant and suggest that

he is unlikely to pose risks that would undermine conditions of community supervision.

**Additional Variance Factors for Consideration**

Prior Sentences

George has only one prior criminal conviction. In 2018, he was convicted of a non-violent misdemeanor related to a worker's compensation insurance violation. He received a three-year term of summary probation, which he completed without difficulty. During that period, he followed every condition the court imposed, including paying his fine and restitution. He had no violations, responded appropriately to all requirements, and ultimately terminated from the probation program successfully. His experience on supervision shows that he can meet expectations, remaining compliant, and resolving matters responsibly when the court places obligations on him.

George's Age and Serious Medical Conditions

George's age and physical condition are significant mitigating factors that support a downward variance. At 69 years old, he is substantially older than the typical federal defendant, and his medical history reflects several serious, chronic conditions that will accompany him for the remainder of his life. As detailed above, he is a throat cancer survivor who continues to suffer permanent swallowing deficits as a result of radiation treatment. He has also undergone a

quadruple coronary artery bypass procedure and remains under treatment for significant cardiovascular disease, hypertension, hyperlipidemia, and other chronic medical conditions.

In late July 2026, George underwent a cardiac catheterization and learned that two of his stents are blocked and cannot be re-stented. His cardiologist offered a deeply concerning prognosis, telling George that his heart is "slowly dying." At this point, George does not know whether his cardiac surgeon back home will consider another open-heart procedure or whether any further surgical intervention is possible. He is now confronting the possibility that his heart disease may be approaching a point for which there are limited treatment options. George has not yet been able to share this news with his family. As he faces this uncertainty and an increasingly immediate sense of his own mortality, his need to be close to his family and friends - and to have their emotional support - has become especially significant.

Although George has worked hard to manage his health conditions and generally functions well, incarceration has been, and will inevitably be, more burdensome for him than it would be for a younger and healthier defendant. His daily life depends upon regular medications, ongoing medical monitoring, and accommodations for the permanent effects of his cancer treatment. Those realities are appropriate considerations under 18 U.S.C. § 3553(a), which requires the Court

to consider the history and characteristics of the defendant in fashioning an individualized sentence.

The district court should not disregard the practical realities of imposing a custodial sentence upon a defendant of George's age and medical condition. Rather, those circumstances are part of the individualized assessment required by § 3553(a). Given George's advanced age, significant health issues, and otherwise productive history, a sentence below the advisory guideline range would satisfy the purposes of sentencing without imposing punishment greater than necessary.

George's Lack of Serious Criminal History

George's criminal history is limited. This prosecution represents his first felony conviction and his first experience facing a term of incarceration. Aside from a single non-violent misdemeanor conviction arising from a workers' compensation insurance violation, for which he successfully completed probation without incident, George has spent nearly seventy years living as a productive and law-abiding member of society.

Equally significant is the fact that George has never served a jail or prison sentence. Courts have long recognized that the deterrent effect of incarceration is often far greater for a first-time offender than for someone who has previously experienced imprisonment. For a defendant who has never been incarcerated, even

a relatively brief custodial sentence carries an extraordinary punitive impact. The prospect of imprisonment itself serves as a powerful deterrent.

Moreover, George's life demonstrates that the conduct before the district court is an aberration rather than part of a continuing pattern of criminal behavior. His honorable military service, decades of lawful business ownership, long-term employment, stable relationships, and successful completion of prior probation all point to an individual who has consistently lived as a responsible member of his community. Under these circumstances, a sentence below the advisory guideline range would adequately promote respect for the law, provide just punishment, and deter future misconduct without imposing a sentence greater than necessary to accomplish those statutory objectives.

George's Lengthy Pretrial Detention Under Harsh Local Jail Conditions

George has remained continuously detained since his arrest on October 8, 2025. By the time of sentencing, he will have spent more than ten months confined in the Pinellas County Jail and in a detention center in San Diego, California. That period of confinement is particularly significant because the advisory federal sentencing guideline imprisonment range in this case is expected to be 0 months to 6 months.[3] Thus, George has already served a substantial portion - if not nearly all

[3] The government has objected to United States Probation's scoring, and if they prevail in their objection, the guideline range will be 6 months to 12 months.

- of the custodial sentence contemplated by the advisory federal sentencing guidelines.

Equally important is the nature of that confinement. George has not been housed in a Bureau of Prisons minimum-security facility or prison camp. Instead, he has spent this entire period in a local county jail, where conditions are substantially more restrictive. County jails generally provide fewer educational, vocational, and rehabilitative programs, more limited recreation, greater isolation, and fewer opportunities for meaningful activity than federal correctional institutions. For an older defendant with significant medical issues, those conditions are especially difficult. Although presentence detention necessarily accompanies many federal prosecutions, the district court may consider the unusually harsh nature of that confinement when evaluating whether a variance is appropriate under § 3553(a).

The amount of time George has already served and the conditions under which that confinement has occurred support the conclusion that additional incarceration would exceed what is necessary to satisfy the purposes of sentencing. A downward variance would appropriately recognize that George has already experienced a substantial measure of punishment under conditions significantly more onerous than those ordinarily associated with a sentence within the advisory guideline range.

## III. Sentencing Position

The issue therefore before this Honorable Court is whether an imprisonment sentence within the federal sentencing guideline range is sufficient but not greater than necessary to comply with the law.

Once this Honorable Court calculates the Defendant's final offense level under the advisory federal sentencing guidelines, based on the criteria set forth in the federal sentencing guidelines from Sections 5K1.1 to 5K3.1, and then considers whether the sentence imposed should be different from either the federal sentencing guideline sentence or the departure sentence (if any), and after considering the factors set forth in 18 United States Code Section 3553(a), the Defendant respectfully suggests a sentence within or above the advisory federal sentencing guideline imprisonment range is greater than necessary to comply with the law and therefore is not reasonable.

Therefore, the remaining issue before this Honorable Court is whether a custodial sentence within or above the federal sentencing guideline imprisonment range is sufficient but not greater than necessary to comply with the law. The Defendant posits not as much as the government, or the advisory federal sentencing guidelines, may argue. In conclusion, the Defendant respectfully submits a custodial sentence is greater than necessary and thus not sufficient under the law.

The Defendant respectfully requests a downward variance and a non-custodial sentence.

## IV. Requests for Judicial Recommendations

The Defendant understands judicial recommendations are just that – mere judicial recommendations. The Defendant understands there is no guarantee that a judicial recommendation will result in action. However, relevant law and prison policy state more weight is given to a judicial recommendation if there is a factual basis on the record for the judicial recommendation.[4] The Defendant therefore makes the following request for a judicial recommendation and in support offers a supporting factual basis.

### A. Prison Location

One of the professed goals of incarceration is rehabilitation. Frequent family visits will allow the Defendant a better opportunity to successfully matriculate through his imposed prison sentence. Frequent visits will also provide short-term

[4] The Bureau of Prisons welcomes judicial recommendations and, by statute and its own policy, is required to consider them. *See* 18 U.S.C. Section 3621 and Program Statement 5100.08, "Inmate Security Designation and Custody Classification". Pursuant to the above statute, the Bureau of Prisons is required to consider the type of offense, the length of sentence, the defendant's age, the defendant's release residence, the need for medical or other special treatment, any placement recommendation made by the court, and all guidance issued by the United States Sentencing Guidelines. Therefore, while the Bureau of Prisons has the sole authority to designate the place of confinement for federal prisoners, if a defendant's judgment and conviction indicates the district court's preference for housing the inmate within a specific institution, geographic area, or specialized program, it must be considered, and every effort will be made to fulfill the district court's recommendation request should there be reasons on the record to support the request.

and long-term benefits to the Defendant and to the community to which he will ultimately return.

Should the Defendant be sentenced to term of imprisonment, and to be clear he should not be, the Defendant requests a recommendation of a federal prison camp as close as possible to San Diego, California. As a factual basis for this recommendation, many of the Defendant's friends reside in the greater San Diego, California area.

If given a custodial sentence, the Defendant respectfully requests a prison location as close to San Diego, California as possible.

## CONCLUSION

WHEREFORE, the Defendant, GEORGE RUSSELL ISBELL, JR., by and through his undersigned counsel prays this Honorable Court will grant the requested relief and/or any other relief deemed necessary.

Respectfully submitted,

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire
Florida Bar No.: 0160210
511 West Bay Street
Suite 330
Tampa, Florida 33606
T: (813) 228-6989
E: mjo@markjobrien.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on August 19, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will then send notice of electronic filing to all counsel of record.

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire